UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HENRY FRANKLIN, *on behalf of himself and others similarly situated,*

Plaintiffs,

-v.-

VERTEX GLOBAL SOLUTIONS, INC. and
FRESH DIRECT, LLC,

Defendants.

---

20 Civ. 10495 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Henry Franklin, on behalf of himself and a putative class of similarly situated job applicants, has sued Defendants Vertex Global Solutions, Inc. ("Vertex") and Fresh Direct, LLC ("Fresh Direct," and collectively, "Defendants") for their alleged use of a pre-employment screening policy that discriminates against job applicants with criminal histories in violation of the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code §§ 8-101 to 8-131, as amended by the Fair Chance Act (the "FCA"), N.Y.C. Local Law 63 (2015). Vertex and Fresh Direct have each moved to dismiss Plaintiff's claims, contending that their hiring practices comply with New York City law and do not discriminate against individuals with criminal histories. Fresh Direct additionally argues that Plaintiff's claims should fail because he has not alleged Fresh Direct's participation in any facet of Plaintiff's employment application with Vertex. For the reasons outlined in the remainder of this Opinion, the Court denies Defendants' motions in full.

## BACKGROUND[1]

### A.   Factual Background

#### 1.   The Parties

Plaintiff Henry Franklin is a citizen of New York and a man with a criminal record.  (Am. Compl. ¶¶ 3, 26).  Defendant Vertex Global Solutions is a staffing agency headquartered in New York.  (*Id.* at ¶ 4).  Defendant Fresh Direct is a Delaware corporation specializing in direct-to-consumer food delivery, with its principal place of business in New York.  (*Id.* at ¶ 5).

#### 2.   Defendants' Hiring Process

On December 6, 2018, Plaintiff arrived at a Fresh Direct facility in the Bronx to participate in a job recruiting program with the company.  (Am. Compl. ¶¶ 21-22).  Upon arriving at the facility that morning, Plaintiff received a nametag that contained his first and last name, the date, and the name "Samantha" clustered below the phrase "freshdirect Vertex."  (*Id.* at ¶ 22; Pl. Ex. A).  Plaintiff was then directed to a waiting area where dozens of other

---

[1]     This Opinion draws its facts from the Amended Complaint ("Amended Complaint" or "Am. Compl." (Dkt. #24)), the well-pleaded allegations of which are taken as true on this motion.  *See Ashcroft* v. *Iqbal,* 556 U.S. 662, 678 (2009).  Additionally, the Court considers the exhibits attached to the Amended Complaint ("Pl. Ex., [ ]"), which are deemed to be part of the pleading.  *See* Fed. R. Civ. P. 10(c).  The Court also relies on certain documents attached to the Certification of Greg Wykoff in support of Vertex's motion to dismiss ("Wykoff Cert., Ex. [ ]" (Dkt. #28-3)), which are incorporated by reference in the Amended Complaint.  *See United States ex rel. Foreman* v. *AECOM,* 19 F.4th 85, 106 (2d Cir. 2021) (describing materials extraneous to a complaint that a court may consider on a motion to dismiss).

For ease of reference, the Court refers to Vertex's memorandum of law in support of its motion to dismiss as "Vertex Br." (Dkt. #28-1); Fresh Direct's memorandum of law in support of its motion to dismiss as "Fresh Direct Br." (Dkt. #30); Plaintiff's consolidated memorandum of law in opposition to Defendants' motions to dismiss as "Pl. Opp." (Dkt. #31); Vertex's reply memorandum of law as "Vertex Reply" (Dkt. #33); and Fresh Direct's reply memorandum of law as "Fresh Direct Reply" (Dkt. #34).

applicants were seated.  (*Id.* at ¶ 23).  After sitting in the waiting area for approximately forty-five minutes, the group of applicants was guided to another room, where a speaker gave a presentation about working for Fresh Direct.  (*Id.*).  Following the presentation, and with no questions asked of them, the applicants in the room each received a document purporting to be a conditional offer of employment that they were told to sign.  (*Id.* at ¶ 24; Pl. Ex. B ("Offer Form")).  The Offer Form recited that Vertex was "pleased to offer you a conditional offer of employment," and provided that the applicant's hourly salary would be $13.00.  (Offer Form).  The form further explained that the employment offer was "contingent upon a satisfactory outcome of the pre-employment screening process, which includes but is [not necessarily] limited to a review of past employment, education records, verification of ability to work in the United States, … history background check and in some cases a drug screen."  (*Id.*).[2]  Plaintiff signed and dated the Offer Form and noted that the time was 11:40 a.m.  (*Id.*).

Shortly after signing the Offer Form, at 11:46 a.m., Plaintiff received and signed another form, this time a release authorizing a background check.  (Am. Compl. ¶ 24; *see also* Wykoff Cert., Ex. 4 ("Background Check Release")).  The release included the question "have you ever been convicted of a crime?" to which Plaintiff responded by checking the box that indicated "no."

---

[2]     The version of the Offer Form included in the Amended Complaint omits or cuts off certain portions of the text.  The Court's alterations in the quoted material fill in the gaps in the form's text, to the extent the missing material can be derived from context.  (*See* Pl. Opp. 5-6 (quoting the same portion of the Offer Form)).

(Background Check Release).[3]  A banner at the top of the release read: "New York City, New York Applicants:  DO NOT RESPOND TO THE QUESTIONS SEEKING CRIMINAL RECORD INFORMATION AT THIS TIME.  You will only have to answer criminal history questions after you receive a conditional offer of employment.  At that time, you will not have to identify arrests or criminal accusations that did not result in a conviction (unless the arrest or criminal accusation is pending)." (*Id.*).  The Background Check Release makes no specific reference to the Offer Form that Plaintiff and the other applicants in the room had signed just moments earlier.

Once Plaintiff signed the Background Check Release, he was told that the recruiting process was complete and that he was free to leave the facility. (Am. Compl. ¶ 25).  Within approximately one to two weeks, Plaintiff received a letter from Vertex, notifying him that his background check had disclosed a criminal record.  (*Id.* at ¶ 26; Pl. Ex. C).  Plaintiff never heard from Defendants again.  (Am. Compl. ¶ 26).  Following the rejection of his application, Plaintiff

---

[3]     Plaintiff alleges that he signed the Background Check Release but did not enter any information on the form aside from his contact information.  (Am. Compl. ¶ 24). Plaintiff's contention, however, is belied by the Background Check Release included in the record, which shows that Plaintiff answered the question related to his prior convictions.  The Court does not understand Plaintiff to be affirmatively challenging the authenticity of this document, inasmuch as he gestures at the possibility that someone else checked the criminal history box.  (*See* Pl. Opp. 12 ("The check mark indicating that he had no conviction history could have been inserted by anyone.")).  It is established in this Circuit that "[w]here a document is referenced in a complaint, the documents control and this Court need not accept as true the allegations in the … complaint."  *Tongue* v. *Sanofi*, 816 F.3d 199, 206 n.6 (2d Cir. 2016) (internal quotation marks omitted).  Accordingly, for the purposes of this motion, the Court will consider Plaintiff to have completed the Background Check Release as reflected in the record.  In any event, as discussed *infra*, the Court's disposition of this motion in no way hinges on any alleged misrepresentation that Plaintiff made concerning his criminal history on the Background Check Release.

claims that the entire hiring process was "a transparent ruse" and that the "sole purpose of gathering at the Fresh Direct facility … was to initiate background checks that would weed out applicants with conviction histories[.]" (*Id.* at ¶ 29).

### 3.     The Relationship Between Vertex and Fresh Direct

Plaintiff alleges that his employment application was for a job with both Vertex and Fresh Direct, even though he formally applied for a job only with Vertex.  (Am. Compl. ¶ 38).  Plaintiff asserts that both Defendants participated in the hiring of Fresh Direct employees, as evidenced by the fact that Vertex held its recruiting event on Fresh Direct's premises.  (*Id.* at ¶ 42).  Moreover, applicants who were hired by Vertex to provide services to Fresh Direct would be formally employed by Vertex for the first few months, after which Fresh Direct would have the option to hire them directly.  (*Id.* at ¶ 38).  Even during the initial period where an individual was formally employed by Vertex, all workers providing services to Fresh Direct through Vertex were subject to Fresh Direct's control and supervision.  (*Id.*).  In his Amended Complaint, Plaintiff includes several images of anonymous employee reviews of Vertex from the website Indeed.com; one of these reviews characterizes Vertex as a "[t]emp agency that provides Full Time Job Opportunit[ies]."  (*Id.*).  Another review describes working for Vertex as actually "a position for freshdirect" and explains that "if you do well you start working for freshdirect."  (*Id.*).

As further evidence of the symbiotic relationship between Defendants, Plaintiff contends that Vertex touts that it offers customized services tailored to

the specific requirements of individual employers like Fresh Direct.  (Am.
Compl. ¶ 41).  According to its website, Vertex advertises to prospective
employer-clients that it "strive[s] to understand your business, culture, and
needs, to ensure we deliver candidates that fit your unique requirements."  (*Id.*;
Pl. Ex. E at 2).  Vertex describes the value it adds to its clients' hiring process
by characterizing itself as "a partner and an extension of your Human
Resources Department."  (Am. Compl. ¶ 41; Pl. Ex. E at 3).  Notably, Vertex
regularly conducted interviews for prospective Fresh Direct employees on-site
at a Fresh Direct facility, as evidenced by an online job posting and Plaintiff's
personal experience.  (Am. Compl. ¶¶ 42-43; Pl. Ex. F).

## B.    Procedural Background

Plaintiff commenced the instant suit by filing the underlying Complaint
on behalf of himself and a putative class on December 11, 2020.  (Dkt. #1).  On
April 30, 2021, Defendants each filed pre-motion letters indicating their intent
to move to dismiss the Complaint.  (Dkt. #16, 17).  Plaintiff filed a letter in
opposition on May 3, 2021.  (Dkt. #19).  The Court scheduled a conference to
discuss these anticipated motions to dismiss, which took place on May 13,
2021.  (Dkt. #20; *see also* Minute Entry of May 13, 2021).  Following this
conference, the Court entered a briefing schedule, which provided Plaintiff an
opportunity to amend his pleading.  (Dkt. #23).

Plaintiff filed the Amended Complaint, which is the operative pleading in
this matter, on June 1, 2021.  (Dkt. # 24).  On July 9, 2021, Defendants filed
their motions to dismiss and supporting papers.  (Dkt. #28-30).  On August 6,

2021, Plaintiff filed his opposition brief.  (Dkt. #31-32).  Thereafter, on August 23, 2021, Defendants filed their reply briefs.  (Dkt. #33, 34).  On January 27, 2022, Plaintiff filed a notice of supplemental authority regarding a recent decision from Judge Caproni in a case in which Plaintiff also sought to serve as named plaintiff in a putative class action.  (Dkt. #35).

## DISCUSSION

### A.    Applicable Law

#### 1.    Motions to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Allco Fin. Ltd.* v. *Klee*, 861 F.3d 82, 94-95 (2d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678).  "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'"  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570).  "[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (internal quotation marks,

alterations, and citation omitted); *see also Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (explaining that a court is not bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions" (citation omitted)).

A court adjudicating a motion to dismiss under Rule 12(b)(6) "may review only a narrow universe of materials." *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). This narrow universe includes "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *United States ex rel. Foreman* v. *AECOM,* 19 F.4th 85, 106 (2d Cir. 2021) (citation omitted). Here, Plaintiff has attached several exhibits to the Amended Complaint, all of which the Court may consider on this motion as part of the pleading. (*See* Pl. Ex. A-F). The Court may additionally consider the Background Check Release that is attached to the Wykoff Certification, because it is incorporated by reference into the Amended Complaint. (Wykoff Cert., Ex. 4; *see also* Am. Compl. ¶ 24 (stating that "Plaintiff signed at the bottom [of the Background Check Release] and provided his contact information but did not enter any other information on the form)). [4]

---

[4]     In addition to reproducing certain of Plaintiff's exhibits (Wykoff Cert., Ex. 1, 3), the Wykoff Certification contains additional documents that appear related to Plaintiff's application for employment with Defendants. (*Id.*, Ex. 2, 5-9). The Court may not consider these documents on this motion, as they are neither referenced in the Amended Complaint, integral to the Amended Complaint, nor proper subjects of judicial notice.

## 2.     New York City's Fair Chance Act[5]

The FCA, which went into effect on October 27, 2015, amended the NYCHRL to provide additional protection from employment discrimination to individuals with criminal histories.  *See* N.Y.C. Local Law 63 (2015); *see also* N.Y.C. Comm'n on Human Rights, Legal Enforcement Guidance on the Fair Chance Act ("Enforcement Guidance") at 1 (June 24, 2016) ("The FCA is intended to level the playing field so that New Yorkers who are part of the approximately 70 million adults residing in the United States who have been arrested or convicted of a crime … [are] 'not overlooked during the hiring process simply because they have to check a box.'").[6]  With the aim of preventing an applicant's criminal history from tainting initial hiring decisions,

---

[5]    The FCA is one of a spate of so-called "ban the box" laws that have proliferated in jurisdictions across the United States; these laws generally prohibit the inclusion of questions related to conviction and arrest histories on job applications and delay criminal background checks until later in the hiring process.  *See* Beth Avery & Han Lu, *Ban the Box: U.S. Cities, Counties, and States Adopt Fair Hiring Policies*, Nat'l Emp. L. Project (Oct. 1, 2021), https://www.nelp.org/publication/ban-the-box-fair-chance-hiring-state-and-local-guide/.

The FCA has been amended several times since its passage in 2015.  *See* N.Y.C. Local Law 40 (2016); N.Y.C. Local Law 63 (2018).  The most recent amendments to the FCA took effect on July 29, 2021, and do not provide for retroactive effect.  N.Y.C. Local Law 4 (2021).

Because Plaintiff sought employment from Defendants on December 6, 2018, the Court's assessment of his claims is guided by the version of the FCA that was in effect on that date.  Likewise, the Court will not consider enforcement guidance published by the New York City Commission on Human Rights (the "NYCCHR"), the agency tasked with enforcing the NYCHRL, that post-dates Plaintiff's application to work for Defendants.  *See* N.Y.C. Comm'n on Human Rights, Legal Enforcement Guidance on the Fair Chance Act and Employment Discrimination on the Basis of Criminal History (January 3, 2022) (currently operative enforcement guidance).

[6]    Even prior to the enactment of the FCA, the NYCHRL prohibited discrimination in hiring based on an applicant's criminal history.  *See* N.Y.C. Admin. Code § 8-107(10).  This provision of the NYCHRL incorporated the requirements of Article 23-A of the N.Y. Corrections Law ("Article 23-A"), which, as discussed below, sets out the circumstances in which an employer may decline to offer employment to a candidate based on a criminal record.  *See* N.Y. Correct. Law §§ 750-755.

the FCA regulates precisely when in the hiring process an employer may seek and use information regarding an applicant's criminal background. *See* Enforcement Guidance 4 ("The FCA prohibits the discovery and use of criminal history before a conditional offer of employment.  During this time, an employer must not seek or obtain an applicant's criminal history.  Consistent with Article 23-A, an employer's focus must instead be on an applicant's qualifications.").  To this end, the FCA deems it an "unlawful employment practice" for most employers to "[m]ake any inquiry or statement related to the pending arrest or criminal conviction record of any person who is in the process of applying for employment with such employer or agent thereof until after such employer or agent thereof has extended a conditional offer of employment to the applicant."  N.Y.C. Admin. Code § 8-107(11-a)(a)(3) (2018).  The FCA defines "any inquiry" as "any question communicated to an applicant in writing or otherwise, or any searches of publicly available records or consumer reports that are conducted for the purpose of obtaining an applicant's criminal background information."  *Id.*  The law further defines "any statement" as "a statement communicated in writing or otherwise to the applicant for purposes of obtaining an applicant's criminal background information regarding: (i) an arrest record; (ii) a conviction record; or (iii) a criminal background check."  *Id.*  The NYCCHR defined "conditional offer of employment" in the Enforcement Guidance as:

> An offer of employment that can only be revoked based on: [i] The results of a criminal background check; [ii] The results of a medical exam in situations in which such exams are permitted by the Americans with

> Disabilities Act; or [iii] Other information the employer
> could not have reasonably known before the conditional
> offer if, based on the information, the employer would
> not have made the offer and the employer can show the
> information is material to job performance.

Enforcement Guidance 2.[7]

After an employer extends a conditional offer of employment to an

applicant, the FCA permits it to make inquiries into an applicant's criminal

history, including by running a background check.  *See* N.Y.C. Admin. Code

§ 8-107(11-b) (2018); *see also* Enforcement Guidance 6.  However, if an

employer wishes to rescind a conditional offer of employment following a

criminal background check, the FCA outlines a legal process (the "Fair Chance

Process"), pursuant to which an employer must first: (i) disclose to the

applicant a written copy of any inquiry it conducted into the applicant's

criminal history; (ii) perform an analysis of the applicant under Article 23-A

and share a written copy of this analysis with the applicant; and (iii) hold the

---

[7]    At the time of Plaintiff's job application, the NYCHRL did not expressly define the term
"conditional offer of employment."  That has since changed, as the 2021 amendments to
the FCA codified a definition of "conditional offer of employment" that is similar to that
contained in the Enforcement Guidance.  The NYCHRL now defines a "conditional offer
of employment" to be:

> [A]n offer of employment, promotion or transfer which may only be
> revoked based on one of the following: [i] The results of a criminal
> background check, conducted in accordance with the provisions of
> this chapter; [ii] The results of a medical exam as permitted by the
> Americans with [D]isabilities act of 1990 … ; or [iii] Other
> information the employer could not have reasonably known before
> making the conditional offer if the employer can show as an
> affirmative defense that, based on the information, it would not
> have made the offer regardless of the results of the criminal
> background check.

N.Y.C. Admin. Code § 8-102 (2021).  The Court does not employ this statutory definition
in its analysis of Plaintiff's claims, as it was not in effect when Plaintiff applied to work
for Defendants.

position open for the applicant for at least three business days from the applicant's receipt of the inquiry and analysis to permit the applicant to respond. *See* N.Y.C. Admin. Code § 8-107(11-a)(b) (2018); *see also* 47 R.C.N.Y. § 2-04(e)(2) (detailing the Fair Chance Process).

Pursuant to Article 23-A, an employer cannot withdraw a conditional offer because of the applicant's criminal record, unless the employer can: (i) draw a direct relationship between the applicant's criminal record and the prospective job; or (ii) show that employing the applicant "would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public." N.Y. Correct. Law § 752. Before concluding that a direct relationship or unreasonable risk exists because of an applicant's criminal history, Article 23-A requires prospective employers to consider eight factors:

> [i] The public policy of [New York] … to encourage the licensure and employment of persons previously convicted of one or more criminal offenses; [ii] The specific duties and responsibilities necessarily related to the license or employment sought or held by the person; [iii] The bearing, if any, the criminal offense or offenses for which the person was previously convicted will have on his fitness or ability to perform one or more such duties or responsibilities; [iv] The time which has elapsed since the occurrence of the criminal offense or offenses; [v] The age of the person at the time of occurrence of the criminal offense or offenses; [vi] The seriousness of the offense or offenses; [vii] Any information produced by the person, or produced on his behalf, in regard to his rehabilitation and good conduct; [and viii] The legitimate interest of the public agency or private employer in protecting property, and the safety and welfare of specific individuals or the general public.

N.Y. Correct. Law § 753; *see also* 47 R.C.N.Y. § 2-04(e)(1).

12

NYCCHR regulations interpreting the NYCHRL, as amended by the FCA, outline six hiring practices that constitute *per se* violations of the FCA.  *See* 47 R.C.N.Y. § 2-04(a).[8]  These *per se* violations are: (i) "[d]eclaring, printing, or circulating … any solicitation, advertisement, policy or publication that expresses, directly or indirectly, orally or in writing, any limitation or specification in employment regarding criminal history"; (ii) "[u]sing applications for employment that require applicants to either grant employers permission to run a background check or provide information regarding criminal history prior to a conditional offer"; (iii) "[m]aking any statement or inquiry relating to the applicant's pending arrest or criminal conviction before a conditional offer is extended"; (iv) "[u]sing within [New York City] a standard form, such as a boilerplate job application, intended to be used across multiple jurisdictions, that requests or refers to criminal history"; (v) "[f]ailing to engage in any step of the legal process outlined prior to rescinding a conditional offer of employment"; and (vi) "[r]equiring applicants or employees to disclose an arrest that, at the time disclosure is required, has resulted in a non-conviction."  47 R.C.N.Y. § 204(a)(1)-(6).

The NYCHRL affords a private right of action to "any person claiming to be a person aggrieved by an unlawful discriminatory practice as defined by [the

---

[8]    The NYCCHR has the authority to promulgate regulations codifying its interpretation of the NYCHRL.  *See* N.Y.C. Charter § 905(e)(9) (empowering the NYCCHR to engage in rulemaking); *id.* § 1043 (outlining the rulemaking process for New York City agencies). The NYCCHR published final regulations interpreting and clarifying the requirements of the FCA in July 2017.  *See* City Record, July 6, 2017, at 3995 (announcing the NYCCHR's adoption of rules to implement the FCA).

NYCHRL.]"  N.Y.C. Admin. Code § 8-502(a) (2018); *see also id.* § 8-107(11-a)(g) (providing that the rights created by the Fair Chance Act shall be enforceable against private employers through the NYCCHR or a civil cause of action).  The NYCHRL defines a "person aggrieved" to include one whose "only injury is the deprivation of a right granted or protected by this chapter."  *Id.* § 8-102; *see also Harding* v. *Donatella GCT LLC*, No. 158886/2017, 2019 N.Y. Misc. LEXIS 1675, at *4 (N.Y. Sup. Ct. Apr. 2, 2019).  The NYCHRL provides that its provisions must "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof[.]"  *Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (quoting N.Y.C. Admin. Code § 8-130).  In light of this statutory directive, courts are to assess NYCHRL claims "broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible."  *Ya-Chen Chen* v. *City Univ. of N.Y.*, 805 F.3d 59, 75 (2d Cir. 2015) (quoting *Mihalik*, 715 F.3d at 109).

## B.   Plaintiff Has Plausibly Alleged a Violation of the NYCHRL, as Amended by the FCA

Plaintiff asserts that Defendants' hiring practices violated his rights under the NYCHRL, as amended by the FCA, because Defendants (i) conducted a background check prior to extending a conditional offer of employment; (ii) declared that a background check would be conducted without first making a conditional offer of employment; and (iii) denied him employment without adhering to the Fair Chance Process.  (Am. Compl. ¶¶ 53-55).  Plaintiff's central allegation is that the document that Defendants labeled a "conditional offer of employment" was a contrivance designed to circumvent the FCA and permit

14

Defendants to scrutinize applicants' criminal histories prematurely in the hiring process. (*See id.* at ¶ 29; Pl. Opp. 5-6). Defendants maintain the legitimacy of their conditional offer of employment and insist that their hiring practices accorded with the FCA. (Vertex Br. 6-7).[9] Defendants further argue that Franklin lost his right to an Article 23-A analysis before they rescinded their conditional offer because Franklin misrepresented his criminal history in executing the Background Check Release. (*Id.* at 8). The Court finds that Plaintiff has plausibly alleged that Defendants feigned a conditional offer of employment before inquiring into his criminal background. Accordingly, Plaintiff has stated a claim pursuant to the NYCHRL, as amended by the FCA.

Central to the parties' dispute in these motions is the legal effect of the Offer Form, and, more specifically, whether Defendants extended to Plaintiff a genuine conditional offer of employment prior to inquiring into his criminal history. In Plaintiff's estimation, the spurious nature of Defendants' conditional offer is evinced by (i) the impersonal and cursory nature of the hiring process and (ii) the language of the Offer Form. (Pl. Opp. 5-12). Plaintiff argues that the superficial application process, combined with the express reservations outlined in the Offer Form, suggest that Defendants' hiring practices were designed to frustrate the FCA's legal framework, which obligates employers to consider job applicants' qualifications and other positive attributes before investigating their criminal history. (*Id.*). Defendants counter

---

[9]     Fresh Direct incorporates by reference and joins the arguments contained in Vertex's submissions on this motion. (Fresh Direct Br. 13; Fresh Direct Reply 8).

that their hiring practices abided by the letter of the law, as the FCA speaks only to the sequence of events that must occur before a prospective employer may inquire into an applicant's criminal background, a sequence Defendants followed. (Vertex Br. 6-7; Vertex Reply 2-3). In essence, Defendants ask the Court to probe no further than the formal document that, they maintain, memorializes a conditional offer of employment. On their view, because the FCA contains no requirement that a prospective employer individually assess a candidate before extending a conditional offer, Plaintiff's allegations that Defendants' hiring procedures wholly lacked the traditional markers of a considered application process — such as the pre-offer exchange of background information, an interview, or any other meaningful screening measure — are of no moment. (*See* Vertex Br. 6). The Court rejects Defendants' suggestion that in pleading an NYCHRL claim, the form of the offer controls over its substance and context. Plaintiff's allegations plausibly call into question whether the Offer Form memorialized a bona fide conditional offer of employment or was merely an artifice to allow premature inquiry into applicants' criminal histories. At this stage of the proceedings, this is all Plaintiff must show to state a claim pursuant to the NYCHRL, as amended by the FCA.

The Court credits both of Plaintiff's arguments suggesting the invalidity of Defendants' purported conditional offer of employment. *First*, Plaintiff alleges that Defendants expended virtually no effort assessing his (or anyone else's) candidacy before extending offers of employment. (*See* Pl. Opp. 6-7). In

16

Plaintiff's telling, he arrived at the Fresh Direct facility, sat through a presentation alongside numerous other applicants, reflexively signed an Offer Form, and immediately thereafter authorized a background check into his criminal history.  (Am. Compl. ¶¶ 22-25).  Defendants' pre-offer procedures allegedly lacked any individualized questioning or assessment of any applicant. What is more, Plaintiff was told he could leave immediately after signing and returning his Background Check Release.  (*Id.* at ¶ 25).  At no point in the hiring process does Plaintiff allege that he faced individualized scrutiny; instead, he alleges an application process whereby Defendants automatically extended job offers to any candidate who remained present at the facility for the prescribed timeframe.  (Pl. Opp. 7-9).[10]

Furthering his point, Plaintiff notes that there was an approximately six-minute gap between when Plaintiff signed the Offer Form and when he signed the Background Check Release authorizing Defendants to investigate his criminal history.  (*See* Pl. Opp. 6; *compare* Offer Form (noting time of signature as 11:40), *with* Background Check Release (noting time of signature as 11:46)).

---

[10]   Defendants claim that prior to receiving the Offer Form, Plaintiff in fact sat for interviews with two Vertex employees, Samantha Kaplan and Maritza Santana.  (Vertex Br. 6; Wykoff Cert. ¶¶ 4-5).  To this point, Defendants suggest — in partial reliance on documents that the Court has decided it cannot consider in adjudicating this motion — that the documentary evidence, such as Plaintiff's nametag that contains the name Samantha (Pl. Ex. A) and a background information form that contains Santana's and Kaplan's signatures (Wykoff Cert., Ex. 2), prove that Plaintiff sat for these interviews. The Court cannot agree.  As an initial matter, these documents do not contain any information resembling interview notes or clearly refer to any interview that might have taken place on the day Plaintiff went to the Fresh Direct facility.  Moreover, Plaintiff disputes that these interviews occurred.  On a motion to dismiss, the Court cannot accept a defendant's factual proffer that squarely contradicts the allegations in the complaint.

Plaintiff argues that this near-immediate turnaround suggests that the Offer Form functioned as "an unlawful demand that job applicants relinquish their rights under the FCA, because its singular purpose [was] to allow Defendants to proceed as though the law did not exist." (Pl. Opp. 6). While Defendants are correct to note that the FCA does not set forth the amount of time that must pass between a conditional offer of employment and a permissible inquiry into a person's criminal history (Vertex Reply 2-3), the Court does not understand Plaintiff to advocate for the imposition of any bright-line temporal limitation in the FCA. Rather, the Court credits Plaintiff's argument that the immediacy of Defendants' distribution of Background Check Release forms *en masse* to a room full of candidates who had, just moments before, been told they had secured conditional offers of employment, may betoken a hiring process specifically geared toward weeding out applicants with criminal backgrounds. This, combined with Plaintiff's other allegations about the nature of the hiring process, call into question whether the Offer Form can fairly be considered a "conditional offer of employment."

Defendants insist that they adhered to the formal sequence of events outlined by the FCA and that, as such, Plaintiff's claims fail as a matter of law. (Vertex Reply 2-3). However, drawing this conclusion at the pleading stage in the present circumstances would effectively authorize employers to conduct the most perfunctory of assessments before opening the door to a candidate's criminal history. The Court admits of the possibility that discovery may bear out that the hiring process was more robust than that detailed in the Amended

Complaint.  But, taking Plaintiff's allegations as true on this motion, Defendants' conditional "offer" of employment appears to operate as a waiver of an applicant's rights under the FCA not to have their criminal history considered at the front end of the hiring process.  In furtherance of the statutory directive to construe the NYCHRL "liberally for the accomplishment of [its] uniquely broad and remedial purposes," N.Y.C. Admin. Code § 8-130, the Court will not interpret the FCA to permit employers to adopt hiring practices that undermine the statute's basic objective of limiting the role that an individual's criminal history plays in making hiring decisions.

 *Second*, Plaintiff argues that the language of the Offer Form undercuts its validity because the offer is expressly conditioned "upon a satisfactory outcome of the pre-employment screening process, which includes but is [not] [nece]ssarily limited to a review of past employment, education records, verification of ability to work in the United States, ... history background check and in some cases a drug screen." (Offer Form).  In Plaintiff's view, that Defendants reserved the right to rescind the offer based on a review of basic background information that could have been made available earlier in the hiring process lends further support to the illegitimacy of the conditional offer of employment.  (Pl. Opp. 5-6, 8-12).  Defendants dispute that the FCA dictates the permissible content of a conditional offer of employment and argue that the information Defendants considered post-offer were things they could not

reasonably have known earlier in the application process.  (Vertex Br. 7; Vertex Reply 3-5).[11]

In the enforcement guidance that was in effect at the time of Plaintiff's job application to work for Defendants, the NYCCHR defined a "conditional offer of employment" as an offer that can only be revoked based on: (i) the results of a criminal background check; (ii) the results of a medical exam; or (iii) *other information the employer could not have reasonably known before the conditional offer,* if this information would have caused the employer not to extend the offer in the first place.  (Enforcement Guidance 2 (emphasis added)).[12]  Matters such as an applicant's employment history, education record, and verification to work in the United States are attributes that an employer can be expected to inquire into at the threshold, prior to making a conditional offer of employment.  Therefore, it would arguably violate the NYCHRL for an employer to rescind a conditional offer of employment based on

---

[11]    In support of Defendants' contention that they only sought information that was unattainable prior to making a conditional offer, Defendants rely on certain additional documents that Plaintiff completed as part of the hiring process, including a Notice and Agreement to Drug Testing, a Disclosure for a Consumer Report, an Acknowledgment and Authorization for a Consumer Report, and his submission of his Social Security Card and New York City Identification Card.  (*See* Vertex Br. 7; Wykoff Cert., Ex. 5-8).  As explained *supra*, the Court declines to consider these documents on this motion, because they are neither incorporated by reference in the Amended Complaint, integral to the pleadings, nor appropriate subjects for judicial notice.

[12]    Under New York law, where a "question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, … the judiciary need not accord any deference to the agency's determination, and is free to ascertain the proper interpretation from the statutory language and legislative intent."  *Belmonte* v. *Snashall*, 2 N.Y.3d 560, 566 (2004).  In these circumstances, the Court is persuaded that the NYCCHR's definition of "conditional offer of employment" hews to the statutory language and legislative intent, even though the version of the FCA in effect on December 6, 2018, did not expressly define a "conditional offer of employment."

the information outlined in the Offer Form.[13]   To be clear, the Court does not read the FCA to prohibit prospective employers from verifying an applicant's credentials and withdrawing an offer if they come to learn that an applicant misrepresented his credentials — indeed, such information is likely not attainable pre-offer.   That said, such is not the issue here, and irrespective of Defendants' rationale for denying Plaintiff employment, the language of the Offer Form lends further support to Plaintiff's contention that Defendants' conditional offer of employment was a hollow formality.

Accordingly, the Court concludes that Plaintiff has plausibly alleged that Defendants failed to make him a genuine conditional offer of employment prior to inquiring into his criminal background, which constitutes an actionable violation of the NYCHRL, as amended by the FCA.[14]

---

[13]   Plaintiff cites updated enforcement guidance from the NYCCHR, which provides that review of a conditional offer "constitutes the last step of the hiring process [and that] [e]mployers cannot circumvent the requirements of the NYCHRL by calling an offer 'conditional' before they have assessed all other employment qualification factors (*e.g.*, academic records or references) aside from criminal history and medical information." (Pl. Opp. 9 (citing N.Y.C. Comm'n on Human Rights, Legal Enforcement Guidance on the Fair Chance Act and Employment Discrimination on the Basis of Criminal History (July 15, 2021)).   This guidance post-dates the events of this case, and thus the Court does not rely on it to resolve Plaintiff's claims.

[14]   Plaintiff additionally argues that Defendants violated the FCA when they withdrew his offer of employment based on his criminal history and without engaging in the Fair Chance Process.  (Pl. Opp. 12-20).  Defendants counter that Plaintiff lost his entitlement to a written Article 23-A analysis when he misrepresented his criminal history on the Background Check Release.  (Vertex Br. 8).  As the Court has determined that Plaintiff has stated a plausible claim based on Defendants' failure to make him a conditional offer of employment prior to inquiring into his criminal history, the Court need not determine whether Defendants further violated the FCA by withdrawing the putative offer of employment.  However, nothing in this Opinion should be read to foreclose Plaintiff from asserting this argument at a later stage in the proceedings.

At the same time, the Court acknowledges that if Plaintiff, in fact, misrepresented his criminal history on the Background Check Release, he may encounter issues qualifying as the class representative for a putative class of similarly aggrieved job applicants. *See, e.g., Bowling* v. *Johnson & Johnson*, No. 17 Civ. 3982 (AJN), 2019 WL 1760162, at *4 (S.D.N.Y. April 22, 2019) ("[C]lass certification is inappropriate where a putative class

C.   **Plaintiff Has Plausibly Alleged that Fresh Direct Was a Joint Employer**

Independent of whether Plaintiff has plausibly alleged a primary violation of the FCA, Fresh Direct asserts that Plaintiff has failed to allege a basis to hold Fresh Direct liable for the hiring practices instituted by Vertex.  (Fresh Direct Br. 1).  Fresh Direct argues that Plaintiff's theory of Fresh Direct's liability is premised entirely on speculation and that the Amended Complaint is bereft of factual allegations tying Fresh Direct to Plaintiff's application for employment with Vertex.  (*Id.* at 7-12; Fresh Direct Reply 2-8).  Plaintiff rejoins that his allegations suggest that Fresh Direct facilitated Vertex's hiring of employees in an illegal manner and that Vertex employees were subject to Fresh Direct's control.  (Pl. Opp. 21-26).  Thus, Plaintiff contends, Fresh Direct may be held liable as either a joint employer or as an aider and abettor of Vertex's discriminatory conduct.  The Court concludes that, at the pleading stage, Plaintiff has plausibly alleged that Fresh Direct both acted as Plaintiff's prospective joint employer and aided and abetted Vertex's discriminatory conduct.

For a corporate defendant to be liable for alleged discrimination under the NYCHRL, the defendant must qualify as the plaintiff's "employer," as

representative is subject to unique defenses which threaten to become the focus of the litigation.").  In any event, the Court deems such issues regarding the typicality and commonality of a putative class representative to be more appropriate for a motion for class certification.  *See, e.g.*, *In re Stillwater Cap. Partners Inc. Litig.*, 853 F. Supp. 2d 441, 445 n.4 (S.D.N.Y. 2012) ("These factual issues [regarding typicality and commonality] should be resolved as part of the class certification motion, not at the motion to dismiss stage."); *Cohen* v. *Gerson Lehrman Grp., Inc.*, 686 F. Supp. 2d 317, 324 (S.D.N.Y. 2010) (finding the contention that "plaintiff [was] an inadequate class representative" to be inappropriate on a motion to dismiss).

defined by the statute.  *See Farmer* v. *Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 321 (S.D.N.Y. 2020) (explaining that courts apply the same test to determine joint employer status under Title VII, the New York State Human Rights Law, and the NYCHRL).[15]  A corporate defendant need not be a plaintiff's direct employer for liability to flow under the NYCHRL.  *Bueno* v. *Eurostars Hotel Co., S.L.*, No. 21 Civ. 535 (JGK), 2022 WL 95026, at *6 (S.D.N.Y. Jan. 10, 2022).  "Under the joint employer doctrine, 'an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violations of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer.'"  *Farmer*, 473 F. Supp. 3d at 322 (quoting *Arculeo* v. *On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005)).  In making the essentially factual determination as to whether two entities are joint employers, courts have considered factors such as "commonality of hiring, firing, discipline, pay, insurance, records, and supervision."  *Id.* at 323 (quoting *Shiflett* v. *Scores Holding Co.*, 601 F. App'x 28,

---

[15]   At the time of Plaintiff's job application, the NYCHRL defined "employer" to include those who hired independent contractors.  *See* N.Y.C. Admin. Code § 8-102 (2018) ("[N]atural persons employed as independent contractors to carry out work in furtherance of an employer's business enterprise who are not themselves employers shall be counted as persons in the employ of such employer.").

As relevant to the instant matter, there does not appear to be a distinct test to determine whether a defendant is a prospective employer, as opposed to an existent employer.  Instead, in failure to hire cases, courts consider whether a defendant is a prospective employer by applying the tests used to determine employer status.  *See, e.g.*, *Franklin* v. *Whole Foods Mkt. Grp., Inc.*, No. 20 Civ. 4935 (VEC), 2022 WL 256460, at *3 & n.6 (S.D.N.Y. Jan. 26, 2022) (applying joint employer test in failure to hire scenario).

30 (2d Cir. 2015) (summary order)).  An "essential element" of such a finding is "sufficient evidence of immediate control over the employees."  *Id.* at 322-23 (citing *Serv. Emps. Int'l Union, Local 32BJ* v. *NLRB*, 647 F.3d 435, 442 (2d Cir. 2011)); *see also Brankov* v. *Hazzard*, 36 N.Y.S.3d 133, 134 (1st Dep't 2016) (applying "immediate control" test to determine whether defendant is joint employer for purposes of NYCHRL).  "The joint employer doctrine has been applied to temporary employment or staffing agencies and their client entities; it has also been applied to contractors and subcontractors and other scenarios where two separate entities have control over an employee's employment."  *Lima* v. *Addeco*, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009), *aff'd sub nom. Lima* v. *Adecco &/or Platform Learning, Inc.*, 375 F. App'x 54 (2d Cir. 2010) (summary order).

Here, Plaintiff has set forth allegations giving rise to the plausible inference that Fresh Direct exercised sufficient control over Vertex employees to make it Plaintiff's prospective joint employer.  In particular, Plaintiff has alleged that Vertex partnered with Fresh Direct to provide staffing services tailored to Fresh Direct's specific needs, going so far as to become "a partner and an extension of [Fresh Direct's] Human Resources Department."  (Am. Compl. ¶ 41; Pl. Ex. E).  Vertex and Fresh Direct cooperated in the recruitment of job applicants, as shown by the fact that Vertex ran its hiring program at a Fresh Direct facility and that applicants were provided a nametag that included the logos of both Vertex and Fresh Direct.  (Am. Compl. ¶ 42; Pl. Ex. A).  Plaintiff further alleges that individuals hired by Vertex worked under the direct

supervision and control of Fresh Direct and sought "to carry out work in furtherance of" Fresh Direct's home grocery delivery business. (Am. Compl. ¶¶ 38-40 (quoting N.Y.C. Admin. Code § 8-102(5)). Importantly for the purposes of the joint employer analysis, employment for Vertex functioned as a probationary period, after which employees who performed adequately could receive a full-time employment offer from Fresh Direct. (*Id.*; *see also* Offer Form). To corroborate the pipeline between Vertex and Fresh Direct, Plaintiff included several anonymous employee reviews attesting to this arrangement. (*See* Am. Compl. ¶ 38).

Fresh Direct correctly notes that "[a]pplication of the joint employer doctrine in the staffing agency context is plausible when the staffing agency has actually placed its employee with the third party, with whom it shared immediate control over the employee." (Fresh Direct Reply 3 (quoting *Felder* v. *U.S. Tennis Ass'n Inc.*, No. 17 Civ. 5045 (ER), 2018 WL 5621484, at *4 (S.D.N.Y. Oct. 30, 2018)). However, the Court disagrees with Fresh Direct's conclusion that the joint employer doctrine is inappropriate in the present circumstances because Plaintiff was denied the opportunity for placement with Fresh Direct. (Fresh Direct Br. 7-8; Fresh Direct Reply 2). It is true that Vertex rejected Plaintiff's job application, thus precluding the possibility that Plaintiff be placed with Fresh Direct. However, the fact that Vertex denied him this opportunity — on an ostensibly discriminatory basis — does not alter Plaintiff's allegations that he applied for a job that entailed providing services to Fresh Direct and being subject to Fresh Direct's supervision and control. *See,*

25

e.g., *Franklin* v. *Whole Foods Mkt. Grp., Inc.*, No. 20 Civ. 4935 (VEC), 2022 WL
256460, at *3-4 (S.D.N.Y. Jan. 26, 2022) (finding companies to be plaintiff's
joint employers where plaintiff applied and was rejected for position with
staffing agency that would have placed him with both companies).  Plaintiff's
allegations detailing the relationship between Fresh Direct and Vertex —
namely, the control that Fresh Direct exercised over individuals hired by Vertex
and the foreseeability that Vertex employees would receive a formal job offer
from Fresh Direct — suggest a sufficient degree of involvement and control by
Fresh Direct to render it plausible that Plaintiff applied for a job in which he
would have been "assigned to work in circumstances that justify the conclusion
that [he was] at the same time constructively employed by [Fresh Direct]."
*Arculeo*, 425 F.3d at 198.

Fresh Direct also cites several cases for the proposition that "even when
a plaintiff establishes an entity's status as part of a joint employer, the plaintiff
must still show 'that the joint employer knew or should have known of the
[discriminatory] conduct and failed to take corrective measures within its
control.'"  (Fresh Direct Br. 8 (quoting *Lima*, 634 F. Supp. 2d at 400); *see also*
Fresh Direct Reply 3-6).  Fresh Direct claims that it cannot be deemed a joint
employer because all of the paperwork associated with Plaintiff's application
referred to Vertex, and Vertex was the entity that provided Plaintiff with an
allegedly sham conditional offer, impermissibly sought authorization to check
his criminal history, and rescinded his offer without engaging in the Fair
Chance Process.  (Fresh Direct Br. 9).  Here too, the Court disagrees with Fresh

26

Direct's conclusion, as Plaintiff has clearly and plausibly alleged that Fresh Direct "knew or should have known of the discriminatory conduct," yet "failed to take corrective measures within its control." *Lima*, 634 F. Supp. 2d at 400. For instance, Plaintiff alleges that Vertex advertised itself as a staffing agency offering customized services to meet the specific needs of individual employers. (Am. Compl. ¶ 41). Given the individualized nature of the services Vertex provided to Fresh Direct, Plaintiff intuits that Fresh Direct was at least aware of — indeed, may even have approved of — Vertex's impermissible culling of applicants with criminal backgrounds. (*Id.* at ¶¶ 41-43). Underscoring this point, Vertex operated on Fresh Direct's premises, where Fresh Direct could readily observe how Vertex operated in service of Fresh Direct. (*Id.* at ¶¶ 42-43; *see also* Pl. Opp. 24-25). These allegations give rise to the plausible inference that Fresh Direct had a measure of control over Vertex and was at the very least aware of how Vertex went about hiring employees on its premises.

Fresh Direct additionally cites *Yousef* v. *Al Jazeera Media Network*, No. 16 Civ. 6416 (CM), 2018 WL 6332904 (S.D.N.Y. Oct. 31, 2018), in support of its position that Plaintiff has not sufficiently alleged Fresh Direct's involvement in Vertex's discriminatory hiring practices. (Fresh Direct Br. 8; Fresh Direct Reply 3). In *Yousef*, a plaintiff alleging claims of gender discrimination, sexual harassment, and retaliation sought to hold a staffing agency that "provided employer of record services to [plaintiff's formal employer], including payroll and human resources services," liable as a joint employer. *Yousef*, 2018 WL 6332904, at *1. However, this case actually

27

undermines Fresh Direct's position, as the court found the staffing agency to be a joint employer where the facts connecting it to the alleged discriminatory conduct were sparser than those alleged here. Indeed, the court denied the staffing agency's motion to dismiss despite the absence of facts specifically connecting the agency to the plaintiff's claims of gender discrimination, sexual harassment, and retaliation. *Id.* at *2. The court reasoned that "[w]hether [the staffing agency] is liable under the joint employer doctrine requires a more fact-intensive inquiry," which could not be resolved in a motion to dismiss. *Id.* So too here.

The other cases cited by Fresh Direct to defeat its liability under the joint employment doctrine are distinguishable. For instance, in *Sosa* v. *Medstaff, Inc.*, the court found a staffing agency not to be liable as a joint employer where the plaintiff failed to assert factual allegations that plausibly connected the purported joint employer to the conduct at issue. No. 12 Civ. 8926 (NRB), 2013 WL 6569913, at *3-4 (S.D.N.Y. Dec. 13, 2013). More specifically, the plaintiff in *Sosa* was a nurse placed by a staffing agency at a healthcare facility who brought claims of discrimination and hostile work environment related to conduct by plaintiff's supervisor at the medical facility. *Id.* at *3. As the claims centered on the supervisor's conduct, the court determined that the staffing agency could not be held liable for plaintiff's claims because the supervisor, who was employed by the medical facility, was "not alleged to have had contact, much less a relationship" with the staffing agency. *Id.* at *1, 4. Here, however, Plaintiff's claims center on the alleged discrimination that Vertex perpetuated

while on Fresh Direct's premises, in the process of hiring employees who were to provide services to Fresh Direct. Fresh Direct engaged Vertex's services for the specific purpose of hiring employees to staff its business operations. In outsourcing this function to Vertex, Fresh Direct plausibly possessed some degree of knowledge and control over what Vertex was doing on its premises for its benefit. Unlike the cases cited by Fresh Direct, Plaintiff's claims of discriminatory hiring go to the crux of the relationship between Fresh Direct and Vertex and necessarily implicate them both.

Fresh Direct also cites two cases in which sister courts in this District denied joint employer status to defendants that exercised only "the minimal level of oversight" that any contractor would naturally exercise over laborers operating on its premises. (Fresh Direct Reply 4-6 (citing *Conde* v. *Sisley Cosmetics USA, Inc.*, No. 11 Civ. 4010 (RJS), 2012 WL 1883508, at *3 (S.D.N.Y. May 23, 2012); *Duff* v. *Pristine Servs., Inc.*, No. 19 Civ. 10423 (RA), 2021 WL 663981, at *4 (S.D.N.Y. Feb. 19, 2021))). In *Conde*, the court determined that a department store was not a plaintiff's joint employer when the plaintiff was formally employed by a company that operated a cosmetics counter within the department store. *Conde*, 2012 WL 1883508, at *1, 3. While the department store subjected the plaintiff to its dress code and workplace rules, the plaintiff's direct supervisor was an employee of the cosmetics company. *Id.* at *1. The plaintiff alleged that her direct supervisor retaliated against her, fabricated allegations of misconduct against her, and compelled the cosmetic company's human resources director to offer her a transfer to a different department

store.  *Id.*  The court found that the cosmetics company, rather than the department store, was her employer, and the fact that the department store was involved in seeking plaintiff's transfer did not compel a contrary finding, because "an entity that has the power to request that an employee be moved but not to cause her to be terminated is not a joint employer."  *Id.* at \*3-4.

In *Duff*, the court concluded that a subcontracting company was not a plaintiff's joint employer when he was formally employed by a general contractor to work on a construction project.  *Duff*, 2021 WL 663981, at \*1, 5. The plaintiff, who brought claims for race discrimination, hostile work environment and retaliation, was supervised at his worksite by an employee of the subcontracting company, and alleged that the subcontractor maintained records of his hours, had the power to discipline him, and provided anti-discrimination training.  *Id.* at \*5.  Citing *Conde*, the court in *Duff* reasoned that these allegations constituted only "'the minimal level of oversight that any' contractor would naturally exercise over laborers working on the contractor's worksite."  *Id.* (quoting *Conde*, 2012 WL 1883508, at \*3).  Furthermore, the court reasoned that the subcontractor's anti-discrimination training merely reflected its interest in managing its workplace and that plaintiff remained employed by the general contractor following his removal from the worksite.  *Id.*

The Court finds there to be a critical distinction between the putative joint employer relationships in *Conde* and *Duff* and that between Fresh Direct and Vertex: Individuals hired by Vertex operated with the expectation that satisfactory performance would lead to a full-time offer from Fresh Direct.  (Am.

Compl. ¶¶ 38-39).  This puts the employer relationship between Vertex and Fresh Direct on a fundamentally different plane than those in *Conde* and *Duff*. In *Conde*, there was no allegation that a protracted period of good work at the cosmetics counter could get someone hired at the department store.  Likewise in *Duff*, good performance for the general contractor would not be expected to lead to a full-time employment opportunity with the subcontractor.  Where the plaintiffs in those cases could have been moved to different department stores or worksites and still maintain their jobs with their formal employers, the job to which Plaintiff applied was restricted at all times to providing services to Fresh Direct.  Furthermore, the first three months of an individual's employment with Vertex constituted a "probationary period" that could lead to a full-time offer with Fresh Direct.  (*Id.*; *see also* Offer Form).  While it is true that Plaintiff would have been aided by additional allegations of precisely how Fresh Direct exercised control over Vertex hires and the extent to which Fresh Direct possessed the power to terminate Vertex employees, these matters are appropriate subjects of inquiry in discovery.  Plaintiff has plausibly alleged that Fresh Direct exercised more control over Vertex's employees than that "minimal level of oversight" incident to any individual working on an employer's premises.  Accordingly, the Court concludes that Fresh Direct and Vertex were Plaintiff's prospective joint employers and, therefore, that Fresh Direct may be held liable for Vertex's alleged NYCHRL violations.[16]

---

[16]    Plaintiff separately argues that Fresh Direct may be held liable for Vertex's discriminatory hiring practices under an aiding and abetting theory.  (Pl. Opp. 25).  To be liable for aiding and abetting under the NYCHRL, the defendant must have "actually

## CONCLUSION

For the foregoing reasons, Vertex and Fresh Direct's motions to dismiss are DENIED.  Defendants are hereby ordered to file Answers to the Amended Complaint by March 9, 2022.  Moreover, the parties are directed to file a proposed case management plan and joint status letter by March 30, 2022.

The Clerk of Court is directed to terminate the pending motions at docket entries 28 and 29.

SO ORDERED.

Dated:       February 9, 2022
             New York, New York

_____
            KATHERINE POLK FAILLA
            United States District Judge

---

participated in the conduct giving rise to the claim." *Malena* v. *Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 367 (S.D.N.Y. 2012) (citation omitted); *see also* N.Y.C. Admin. Code § 8-107(6) (making it an "unlawful discriminatory practice" for anyone "to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so").  The aider and abettor must "share the intent or purpose of the principal actor" to give rise to liability, "and there can be no partnership in an act where there is no community of purpose." *Fried* v. *LVI Servs., Inc.*, No. 10 Civ. 9308 (JSR), 2011 WL 2119748, at *7 (S.D.N.Y. May 23, 2011).

The Court finds that Plaintiff has also plausibly alleged that Fresh Direct actually participated in Vertex's conduct giving rise to his discrimination claims.  Plaintiff asserts that Fresh Direct lent its facility to Vertex for the purpose of effectuating unlawful hiring practices, which Fresh Direct either explicitly authorized or condoned. (*See* Am. Compl. ¶¶ 41-43).  In light of Plaintiff's allegations concerning the specialized services that Vertex provided to Fresh Direct (*see id.* at ¶¶ 38-39), the Court determines that Plaintiff has stated a plausible claim that Fresh Direct aided and abetted the commission of unlawful discrimination.